No. 23,362.

THE STROUP LUMBER COMPANY, *Appellant,* v. WILSON C. LARMOR et al. (THE FIRST NATIONAL BANK, of Garden City, *Appellee.*)

SYLLABUS BY THE COURT.

1. MECHANIC'S LIEN—*License to Use Land Creates No Estate Therein to Which a Lien Can Attach.* One having a mere license with respect to realty has no estate or interest therein, and under our statute a mechanic's lien cannot attach to a building which he erects upon it.

2. SAME—*Contract Involved Not a Lease of Land.* The contract involved in the present case is held not to be a lease, but an agreement by the owner of land that another person might erect a sorghum mill thereon and maintain it long enough to enable him to extract the syrup from his cane then on hand, the right thereby acquired being merely a license, incapable of supporting a mechanic's lien.

Appeal from Finney district court; CHARLES E. VANCE, judge. Opinion filed March 11, 1922. Affirmed.

*R. W. Hoskinson, Robert S. Field,* both of Garden City, *J. O. Wilson* and *J. H. Wilson,* both of Salina, for the appellant.

*Edgar Foster, Horace J. Foster,* and *H. O. Trinkle,* all of Garden City, for the appellee.

The opinion of the court was delivered by

MASON, J.: Wilson C. Larmor obtained permission from the owner of a tract of land to erect and operate a sorghum mill thereon. He built and used the mill, a structure twenty feet long and twelve. or fourteen feet wide, purchasing a part of the material from Stroup Lumber Company, which filed a claim under the mechanic's lien statute. This action is brought to foreclose such lien, and subject thereto material which has passed into the hands of the First National Bank of Garden City, the building having been taken down. The plaintiff contends that Larmor had an oral lease on the land, which would sustain a lien; the bank contends that he had only a license, which would not. A demurrer to the plaintiff's evidence was sustained and it appeals.

1. If Larmor was a mere licensee he had no interest or estate in the realty, and under our statute there was nothing to which a lien could attach. (*Oil Co. v. McEvoy,* 75 Kan. 515, 89 Pac. 1048; *Oil Co. v. Pennel,* 76 Kan. 785, 92 Pac. 1101.) This is not controverted, the plaintiff relying upon the contention that he had a lease.

2. The question to be determined is therefore whether a finding that the relation of landlord and tenant existed would have been warranted. The land in question was a part of a tract belonging to the county which had been purchased and formerly used as a poor farm. At the time of the transactions involved, however, it had been rented by the county to one Jesse Stansifer. Larmor had some cane in the neighborhood from which he wished to extract the syrup. He came to Stansifer and asked permission to erect a mill on a part of the tract for the purpose. This was given by Stansifer and the county commissioners and acted upon by Larmor. Stansifer gave this testimony:

"Q. Did Wilson C. Larmor build a syrup factory and silo on part of the ground you had rented from the county? A. Yes.

"Q. Did he make arrangements with you beforehand about building these buildings there? A. He came and asked me and I wouldn't give my consent until he had seen the county commissioners, and between us we gave his consent to build there.

"Q. What was he to pay you for the use of that ground? A. He was to give me $25.

"Q. For how long a period of time was he to have it? A. Just during the campaign, while he was making the molasses.

"Q. During the period of time to make his sorghum into syrup? A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. This land that you rented to him was a part of the poor farm, part of the county farm? A. Yes, sir.

"Q. It was that part next to the pumping plant there? A. Yes.

"Q. Along the Santa Fe track on the north side? A. The Santa Fe track run there, the Sugar Company track south of the Santa Fe, run right along the edge of the sugar factory track, the Santa Fe track went west too, and this is on the north side of the track at the northwest corner of the poor farm place. . . .

"Q. What land did you lease Larmor? A. I leased him, you mean how much land?

"Q. Yes sir, describe the land you leased him. A. Well, it was the place coming out in smooth iron shape. The railroad cut off one corner and I just let him move up in that smooth iron shape with his building.

"Q. When you leased it to him wasn't anything said particularly about the description of the land? A. I don't know as there was, he just came to me and wanted to know if he could lease an acre or so; I said go ahead and help yourself providing you don't damage me and the commissioners are willing.

"Q. You gave him permission? A. Yes, sir.

"Q. And he consented to give you $25 to make his sorghum there on that place? A. Yes."

The words "rented" and "leased" used by the witness of course do not serve to characterize the transaction in its legal aspect. Whether or not the relation of landlord and tenant was established must be determined by the nature of the right which it was the intention of the parties should be acquired by Larmor. For the arrangement to amount to a lease it was essential that he should have been given a right to the possession of some part of the land even as against Stansifer; otherwise he was a mere licensee. (25 Cyc. 640; 16 R. C. L. 549.) We think it clear upon the whole record that what Larmor desired and what he obtained was the privilege of erecting his mill on the land and keeping it there for so long as it should take to extract the molasses from his sorghum—that he neither asked nor was given the exclusive possession of any part of the tract. It is true that the mill upon its erection would necessarily occupy a portion of the surface to the exclusion of anything else, but this is not enough to meet the condition stated—to constitute a right to exclusive possession. "Every license to do an act upon land in-

volves the exclusive occupation of the land by the licensee, so far as is necessary to do the act, and no further." (*Lowell v. Strahan,* 145 Mass. 1, 12.) Agreements have been held to be licenses by which the owner of realty has given to another permission to maintain thereon horse sheds (*Druse v. Wheeler,* 22 Mich. 439), a logging road (*Nowlin Lumber Co. v. Wilson,* 119 Mich. 406), a bathhouse (*Brower v. Wakeman,* 88 Conn. 8), a sheet-music business in space in a department store for which "rental" was to be paid (*R. H. White Co. v. Remick & Co.,* 198 Mass. 41), and billboards (*United Merchants' R. & I. Co. v. N. Y. Hippodrome,* 118 N. Y. Supp. 128, affirmed in 201 N. Y. 601; *C. J. Sullivan Advertising Co. v. Goldsticker,* 130 N. Y. Supp. 1021), and to flow the land with water (*Johnson v. Skillman,* 29 Minn. 95.) A permit to graze sheep although called a lease has been held to be but a license. (*Boley v. Butterfield,* [Utah] 194 Pac. 128.) "The occupancy by a licensee may and often is of a very temporary character, but it also may be in some cases for rather notorious and continuous purposes, such as maintaining a building or other residence thereon." (*Vicker v. Byrne,* 155 Wis. 281, 284.)

In *Lumber Co. v. Malone,* 8 Kan. App. 121, a writing by which a railroad company gave what it termed a license or permit to erect a hay barn on its right of way (of which it owned the fee) was treated as a lease conveying an estate sufficient to support a mechanic's lien. The syllabus and the cases cited in the opinion relate wholly to the question whether the word "owner" in the statute includes one who has a leasehold or other interest less than full ownership. So far as the decision depends upon regarding the contract there set out as a lease we must decline to follow it.

The judgment is affirmed.